# Use of the "Pocket Veto" During Intersession Adjournments of Congress

Under the Constitution, the President has the power to veto an enrolled bill by "return[ing] it, with his objections to that House in which it shall have originated" within ten days of the bill's being presented to the President. If, however, "the Congress by their Adjournment prevent [a bill's] Return" from the President, he may veto the bill simply by failing to sign it (*i.e.*, by "putting it in his pocket"). Congress may not override a pocket veto of a bill by a two-thirds vote of both Houses. Rather, the bill must be reintroduced and repassed by both Houses and resubmitted to the President for his approval or veto.

The Supreme Court has held that Congress' appointment of an officer or agent to receive returned bills from the President during an intersession adjournment does not preclude the President from exercising a pocket veto. The Court has also held, however, that an ordinary "return veto" was valid when the President returned a bill to the Secretary of the Senate while that House was in an intrasession adjournment of three days or less.

Despite lower court decisions questioning the continued validity of the Supreme Court's reasoning, use of the pocket veto during intersession adjournments remains valid, whatever steps Congress may take to receive returned bills during such and adjournment. The Supreme Court has not decided whether the pocket veto can be exercised when one House, but not the other, has adjourned *sine die* or for an intersession recess. Nor has that Court decided whether the pocket veto can be used during intrasession adjournments lasting longer than three days.

December 19, 1983

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT

This memorializes our response to your questions whether the President should use the "pocket veto" or the "return veto" during the present intersession adjournment of Congress, and whether there have been any recent developments in the law that would affect the advice that we have previously given to you on this subject.

Congress is currently in an intersession adjournment. The House and Senate adjourned *sine die* on November 18, 1983. *See* H.R. Con. Res. 221, 129 Cong. Rec. 34334 (1983). By separate resolution, the House and Senate agreed to reconvene on January 23, 1984, for the second session of the 98th Congress. *See* H.R.J. Res. 421, 129 Cong. Rec. 33123 (1983); *id.* at 34334.[1] Before

---

[1] Congress traditionally ends a session by a *sine die* adjournment at a date specified by concurrent resolution of both Houses. The 20th Amendment to the Constitution requires that Congress assemble each year on January 3 "unless they shall *by law* appoint a different day." (Emphasis added.) Thus, although Congress can adjourn by concurrent resolution, it must establish a return date other than January 3 by a *law*. Therefore, the time for reassembly is fixed, at the time of adjournment, by a joint resolution which must be presented to the President and which, when signed, has the force of a law. Although a joint resolution specifies the date for return, the adjournment by concurrent resolution is considered to be *sine die*.

adjourning, the Senate authorized the Secretary of the Senate to receive messages from the President during the adjournment.[2] Under House Rule III-5, the House Clerk is authorized to receive such messages "at any time that the House is not in session."[3] H.R. Con. Res. 221 also provides that both Houses may be reconvened two days after Members are notified to reassemble by the Speaker and the Majority Leader of the Senate "acting jointly," after each consults with the Minority Leader of the House and the Minority Leader of the Senate, respectively, "whenever, in their opinion, the public interest shall warrant it."

The practical consequence of a decision to exercise a pocket veto, instead of a return veto, is significant. Congress may override a return veto by a two-thirds vote of both Houses; a bill which is pocket vetoed must be reintroduced and repassed by both Houses and resubmitted to the President for his approval or veto. But if a court were to determine that an attempted pocket veto of a bill was ineffective, that bill would become law because it had not been disapproved within ten days (Sundays excepted) after it was presented to the President.

The pocket veto power is very significant because it may often be much more difficult for proponents of legislation to start the legislative process anew, repass legislation, and overcome a second Presidential veto than simply to override the first veto. Time and inertia, extremely important factors in American political life, make the pocket veto a potent Presidential weapon. This is particularly so given Congress' increasing propensity to be unable to pass much legislation except in the last few days of a congressional session. Because of this phenomenon, the pocket veto is available for use against a disproportionate number of bills. For example, out of 146 bills (public laws only) passed during the first session of the 97th Congress, 53 or more were presented to the President within ten days (Sundays excepted) prior to or after adjournment. Fifty-two of those bills were approved; one was disapproved by pocket veto. Others presented within the ten days (Sundays excepted) may have been signed in less than ten days. For the first sessions of 94th, 95th, and 96th Congresses, the corresponding figures are as follows:

94th Congress:  50 or more presented out of 207 passed (48 were signed, 2 were disapproved)

95th Congress:  13 or more presented out of 223 passed

96th Congress:  35 or more presented out of 187 passed

---

[2] Senator Baker
    ask[ed] unanimous consent that during the *sine die* adjournment of the Senate, messages from the President of the United States and the House of Representatives may be received by the Secretary of the Senate and appropriately referred, and that the Vice President, President pro tempore, and acting President pro tempore, may be authorized to sign duly enrolled bills and joint resolutions. Without objection, it was so ordered. *See* Authority for Certain Action During *Sine Die* Adjournment and Upon Reconvening of the Senate, 129 Cong. Rec. 34679 (1983).

[3] The House Rule provides:
    The Clerk is authorized to receive messages from the President and from the Senate at any time that the House is not in session.
Rules of the House of Representatives, Rule III-5.

As a matter of political dynamics, even a slight increase or decrease in Presidential power may have enormous impact on the President's influence with Congress. The pocket veto, therefore, should be appreciated as a tool of no little significance.

Because of the short time typically available for analysis at the time that a veto decision is required, and because of the adverse consequences of an erroneous decision to pocket veto a bill rather than return it, with objections, to the originating House, we have previously examined in rather comprehensive fashion the legal issues associated with pocket vetoes in situations that are likely to arise in the future.[4] We have also carefully memorialized oral advice, whenever we have given it, so that it may be readily available for review when needed. We continue these practices in this memorandum, which reaffirms and supplements the conclusions in our prior memoranda and confirms our oral advice on this occasion.

We have consistently advised your Office on prior occasions that disapproval by inaction, the pocket veto, is the appropriate method of Presidential disapproval after a *sine die* adjournment of the Congress, where the end of the President's constitutional period for approving or disapproving a bill falls during the adjournment.[5] That advice is fully applicable to the present adjournment. In our view, neither the designation of an agent to receive messages from the President nor the provision for the possible recall of Members affects this conclusion.

## I. Background

Article I, § 7, cl. 2 of the Constitution provides in part:

> Every Bill which shall have passed the House of Representatives and the Senate, shall, before it becomes a Law, be presented to the President of the United States; If he approve he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the Objections at large on their Journal, and proceed to reconsider it. If after such Reconsideration two thirds of that House shall agree to pass the Bill, it shall be sent, together with the Objections, to the other House, by which it shall likewise be reconsidered; and if approved by two thirds of that House, it shall become a Law. . . . If any Bill shall not be returned by the President within ten Days (Sundays excepted) after it shall have been presented to him, the Same shall be a Law, in like Manner

---

[4] *See* "Approval and Disapproval of Bills by the President after *Sine Die* Adjournment of the Congress," 6 Op. O.L.C. 846 (1982); "The Pocket Veto: Historical Practice and Judicial Precedent I," 6 Op. O.L.C. 134 (1982); "The Pocket Veto: Historical Practice and Judicial Precedent II," 6 Op. O.L.C. 150 (1982).

[5] *See* the memoranda cited *supra* note 4. *See also* Memorandum for the President from Griffin B. Bell, Attorney General (May 13, 1977) (attaching Memorandum for the Attorney General from John M. Harmon, Acting Assistant Attorney General, Office of Legal Counsel (May 13, 1977)).

> as if he had signed it, *unless the Congress by their Adjournment*
> *prevent its Return, in which Case it shall not be a Law.*

(Emphasis added.) The highlighted phrase is commonly referred to as the "Pocket Veto Clause" because it empowers the President to prevent a bill from becoming law simply by placing it in his pocket, *i.e.,* neither signing it nor returning it with his objections to its House of origin. As noted above, the functional difference between ordinary vetoes and pocket vetoes is that Congress cannot override the latter.

In *The Pocket Veto Case,* 279 U.S. 655 (1929), the Supreme Court upheld the use of a pocket veto during an intersession adjournment of the 69th Congress. Justice Sanford's opinion for the Court concluded that the word "adjournment" was not limited to final adjournments of a Congress, but also included interim adjournments. The determinative factor with regard to an adjournment was whether it "prevented" the President from returning the bill within the time allowed to the House in which it originated. In resolving this question, the Court rejected the argument that a bill could be "returned" to the House within the meaning of the constitutional provision if it was returned to an officer or agent of the House to be held by him and delivered to the House when it resumed its sittings at the next session. The Court stated:

> under the constitutional mandate [the bill] is to be returned to the 'House' when sitting in an organized capacity for the transaction of business, and having authority to receive the return, enter the President's objections on its journal, and proceed to reconsider the bill; and . . . no return can be made to the House when it is not in session as a collective body and its members are dispersed.

*Id.* at 683.

Delivery of the bill to an officer or agent, even if authorized by Congress, "would not comply with the constitutional mandate":

> The House, not having been in session when the bill was delivered to the officer or agent, could neither have received the bill and objections at that time, nor have entered the objections upon its journal, nor have proceeded to reconsider the bill, as the Constitution requires . . . . Manifestly it was not intended that, instead of returning the bill to the House itself, as required by the constitutional provision, the President should be authorized to deliver it, during an adjournment of the House, to some individual officer or agent not authorized to make any legislative record of its delivery, who should hold it in his own hands for days, weeks or perhaps months, — not only leaving open possible questions as to the date on which it had been delivered to him, or whether it had in fact been delivered to him at all, but

190

keeping the bill in the meantime in a state of suspended animation until the House resumes its sittings, with no certain knowledge on the part of the public as to whether it had or had not been seasonably delivered, and necessarily causing delay in its reconsideration which the Constitution evidently intended to avoid. In short, it was plainly the object of the constitutional provision that there should be a timely return of the bill, which should not only be a matter of official record definitely shown by the journal of the House itself, giving public, certain and prompt knowledge as to the status of the bill, but should enable Congress to proceed immediately with its reconsideration; and that the return of the bill should be an actual and public return to the House itself, and not a fictitious return by a delivery of the bill to some individual which could be given a retroactive effect at a later date when the time for the return of the bill to the House had expired.

*Id.* at 684–85.

Use of the return veto during a brief, intrasession recess of only one House of Congress was upheld in Wright v. United States, 302 U.S. 583 (1938).[6] There, the Supreme Court held that "Congress" had not adjourned when only one House, the Senate, recessed for three days while the other was in session.[7] The Court rejected both legal and practical arguments that the President was "prevented" from returning a bill because of the Senate's recess:

In returning the bill to the Senate by delivery to its Secretary during the recess there was no violation of any express requirement of the Constitution. . . .

Nor was there any practical difficulty in making the return of a bill during the recess. The organization of the Senate continued and was intact. The Secretary of the Senate was functioning and was able to receive, and did receive, the bill. . . . There is no greater difficulty in returning a bill to one of the two Houses when it is in recess during the session of Congress than in presenting a bill to the President by sending it to the White House in his temporary absence.

*Id.* at 589–90.

---

[6] We do not believe that there is any constitutional significance to the designation of a period when one or both Houses are not in session as a "recess" or an "adjournment" for purposes of determining whether a return or a pocket veto is appropriate. There are certain technical practices which are unique to the House or the Senate and from which certain parliamentary consequences flow, but the difference does not depend on duration or the consent of the other House. In this memorandum, we use the terms "recess" and "adjournment" to mean any period in which Congress or one House is not in session. We do not, however, characterize the normal day-to-day or weekend interruptions in the session of Congress as adjournments for pocket veto purposes within the meaning of the Constitution.

[7] The Constitution provides that "neither House, during the Session of Congress, shall, without the Consent of the other, adjourn for more than three days." U.S. Const. art. I, § 5, cl. 4.

The Court distinguished *The Pocket Veto Case* on the ground that the dangers inherent in an intersession adjournment were not present in the context of a brief intrasession recess of three days or less by only one House. *Id.* at 595. As discussed more fully in Part II, below, the Court specifically declined to address the question whether an intrasession adjournment of more than three days, for which the consent of both Houses is required pursuant to Article I, § 5, cl. 4, would prevent the return of a bill and thereby trigger the pocket veto provision. *Id.* at 598. The holding of the case was therefore expressly limited to the statement that the return veto could be used to prevent a bill from becoming law "where the Congress has not adjourned and the House in which the bill originated is in recess for not more than three days under the constitutional permission while Congress is in session." *Id.* at 598.

More recently, in *Kennedy* v. *Sampson,* 511 F.2d 430 (D.C. Cir. 1974), the United States Court of Appeals for the District of Columbia Circuit considered a challenge by a Senator to a pocket veto of a bill, for which he had voted, during a brief intrasession adjournment (six days for one House, five for the other) of both Houses. The district court granted summary judgment for the plaintiff. The court of appeals affirmed, holding that the adjournment fell within the rule of *Wright* v. *United States,* not *The Pocket Veto Case.* Moreover, the court's opinion concluded that a pocket veto would have been inappropriate even under the standards set forth in *The Pocket Veto Case:* "The modern practice of Congress with respect to intrasession adjournments creates neither of the hazards — long delay and public uncertainty — perceived in the *Pocket Veto Case.*" *Id.* at 440. According to the court, "intrasession adjournments of Congress have virtually never occasioned interruptions of the magnitude considered in the *Pocket Veto Case,*" *id.* at 441.; and "[m]odern methods of communication" make the return of a disapproved bill to the appropriate officer of the originating House a matter of public record accessible to every citizen. *Id.* The court therefore broadly concluded that:

> an intrasession adjournment of Congress does not prevent the President from returning a bill which he disapproves so long as appropriate arrangements are made for the receipt of presidential messages during the adjournment.

*Id.* at 437. *See also id.* at 442.

In a subsequent case, *Kennedy* v. *Jones,* 412 F. Supp. 353 (D.D.C. 1976), the Government entered into a consent judgment with the plaintiff, who had challenged the President's pocket veto of two bills, one during an intersession adjournment and the other during an intrasession election adjournment of thirty-one days. The same day that judgment was entered, President Ford announced that he would not invoke his pocket veto power during intrasession or intersession recesses or adjournments if the originating House had specifically authorized an officer or other agent to receive returned bills during such periods. That announcement was limited to President Ford's intended use of

the pocket veto.[8] It did not purport to bind, and, in our view, could not have bound, future Presidents. President Reagan has made no similar statement, nor did President Carter during his Presidency.

## II. Analysis

As we have stated in our prior memoranda, we are confident that the President may pocket veto bills when the President's constitutional period for exercising his veto power ends during an intersession adjournment of Congress.

### A. The Case Law

We believe that *The Pocket Veto Case* stands for the proposition that intersession pocket vetoes are not only appropriate, but required. The Court in Wright distinguished *The Pocket Veto Case* and strongly implied that the earlier decision was still the law with respect to intersession adjournments:

> However real th[e] dangers may be when Congress has adjourned and the members of its Houses have dispersed at the end of a session — the situation with which the Court [in *The Pocket Veto Case*] was dealing — they appear to be illusory when there is a mere temporary recess.

302 U.S. at 595.

Our conclusion that pocket vetoes are the appropriate veto mechanism during an intersession adjournment is not inconsistent with the District of Columbia Circuit's holding in *Kennedy* v. *Sampson,* which involved intrasession vetoes. To the extent that the district court's judgment in *Kennedy* v. *Jones* is inconsistent with our conclusion, we believe that it is incorrect and inconsistent with both *The Pocket Veto Case* and *Wright.* In any event, *Kennedy* v. *Jones* is not a meaningful precedent because of the nonadversarial nature of the outcome. The court never did address the issues on the merits.

We therefore continue to read the case law to preserve the President's power to use the pocket veto during an intersession adjournment of Congress. We believe that the holding in *Wright* regarding a recess of one House should be limited to the facts of that case: a short (up to three day) intrasession recess or adjournment of one House. For, just as *Wright* held that the return veto was appropriate on those facts, *The Pocket Veto Case* held that the pocket veto was required during a lengthy intersession adjournment by both Houses. *Wright* neither expressly overruled *The Pocket Veto Case* nor challenged that Court's

---

[8] Following the decision in the *Kennedy* v. *Jones,* the Department of Justice issued a press release stating: President Ford has determined that he will use the return veto rather than the pocket veto during intrasession and intersession recesses and adjournments of the Congress, provided that the House of Congress to which the bill and the President's objections must be returned according to the Constitution has specifically authorized an officer or other agent to receive return vetoes during such periods.
Department of Justice Press Release (Apr. 13, 1976).

perception of and remedy for the dangers attendant to a lengthy intersession adjournment. *See The Pocket Veto Case,* 279 U.S. at 684–85. In between the extremes of these two cases lies a number of other factual situations in which the result cannot be clearly derived from *Wright.* For example, we suspect that the holding in *Wright* would not control if either House has adjourned *sine die* at the end of a Congress: the Congress as a whole would not be in a position to reconsider a bill returned to it. An intersession adjournment by one House might also present a much more difficult issue for the Court than the short recess in *Wright.* Finally, the most difficult situation under the analysis in *Wright* would be an intrasession adjournment by one House of Congress longer than three days. The Court in *Wright* expressly declined to predict the result in such circumstances, stating:

> [W]e have no such case before us and we are not called upon to conjecture as to the nature of the action which might be taken by the Congress in such a case, or what would be its effect.

*Wright,* 302 U.S. at 598. It is therefore clear that *Wright* cannot be read as the final word on these issues. It goes without saying, of course, that what *Wright* preserved of *The Pocket Veto Case,* the District of Columbia Circuit could not on its own authority destroy. Thus, we conclude that if both Houses of Congress have adjourned *sine die* between sessions of Congress, their adjournment "prevents" the President's return of a bill within the meaning of the Pocket Veto Clause.

## B. The Effect of President Ford's Announcement

As we stated in our November 15, 1982 memorandum, *see* 6 Op. O.L.C. at 151–52, we do not believe that subsequent Presidents should consider themselves bound by President Ford's self-imposed restrictions on his use of the pocket veto. Moreover, as the Supreme Court so recently reaffirmed, any doubt that the President's approval could immunize a practice from constitutional scrutiny was resolved in *Marbury* v. *Madison,* 5 U.S. (1 Cranch) 137 (1803). *See INS* v. *Chadha,* 462 U.S. 919, 942 n.13 (1983).

## C. The Receipt of Messages

As we discussed in our previous memoranda, specific authorizations of agents to receive messages from the President have been customary for intersession and intrasession adjournments in both Houses. The Senate's provision for receipt of messages by the Secretary of the Senate during the present intersession adjournment appears unexceptional in this regard. Since 1981, it has not been necessary for the House to adopt *ad hoc* provisions because it has maintained a standing Rule providing for receipt of messages from the President and the Senate whenever the House is not in session. As we noted in our memorandum of November 15, 1982, however, the House Parliamentarian's

comments make clear that the House Rule, originally adopted by the 97th Congress, H.R. Res. 5, 127 Cong. Rec. 98 (1981), was added to facilitate, if possible, the use of the return veto during intrasession recesses and thereby to discourage use of the pocket veto at that time. *See* 6 Op. O.L.C. at 151. The Parliamentarian's comments do not mention intersession pocket vetoes. Moreover, the legislative history of House Rule III-5 supports this interpretation. Congressman Michel entered an analysis of the January 1981 Rules changes into the *Congressional Record* prior to their adoption, 127 Cong. Rec. 99–102 (1981), in which he explained that the proposed rule applied only to "non sine die adjournments." *Id.* at 100. We therefore believe that the Senate's appointment of an agent to receive messages during the current adjournment and the House's standing delegation of authority to receive messages were not intended to, and do not, require the President to use a return veto during an intersession adjournment.

## D. The Recall Provision

For similar reasons, we believe that the provision in H.R. Con. Res. 221, authorizing the recall of Members upon two days' notice by joint action of the Speaker of the House and the Majority Leader of the Senate, does not affect the use of the pocket veto during an intersession adjournment. First, there is no indication in either the language or the legislative history of the Concurrent Resolution that it was intended to prevent the President's use of the pocket veto. The "public interest" standard specified in the Concurrent Resolution for the recall of Congress is at least as consistent with a conclusion that the provision was intended to permit Congress to reconstitute itself to deal with unanticipated crises in foreign or national affairs. A similar clause was included, for example, in H.R. Con. Res. 68, by which the 79th Congress adjourned during the first session in 1945 shortly after the end of World War II. *See* 91 Cong. Rec. 7733–34, 7911–12 (1945). *See also* H.R. Con. Res. 412, 93d Cong., 1st Sess., 119 Cong. Rec. 43323, 43327 (1973).[9]

Second, even if the Congress had indicated an intention to preclude use of the pocket veto during this intersession adjournment, we do not believe that the provision in H.R. Con. Res. 221 could accomplish that objective. The Concurrent Resolution merely provides that the Speaker and the Majority Leader, acting jointly, *may,* at their discretion, recall the Members on two days' notice. Under the reasoning of *The Pocket Veto Case,* once Congress adjourns, there is no functioning "House" in the constitutional sense to which a bill can be returned. Moreover, because the recall is discretionary, the President could not

[9] A prior memorandum written in this Office considered the effect of the recall provision in H.R. Con. Res. 412 on the use of the pocket veto during the intersession *sine die* adjournment of the 93rd Congress. That memorandum concluded that the recall provision was not effective to require the use of the return veto. A similar recall provision was included in S. Con. Res. 42, 93d Cong., 2d Sess., 119 Cong. Rec. 26427 (1973). *The Guide to Congress* (Congressional Quarterly, 3d ed. 1982) states that S. Con. Res. 42 revived a procedure that had not been used in 25 years. *See also* H.R. Con. Res. 697, 93d Cong., 2d Sess., 120 Cong. Rec. 41815 (1974).

know in advance whether Congress in fact would be recalled to reconsider a bill returned with his objections. The Congress could remain adjourned and "prevent" the return of the bill — the precise situation the Pocket Veto Clause was designed to prevent. We do not believe the mere possibility that Congress could be recalled can affect the constitutional power of the President that arises on the adjournment of Congress *sine die*. Indeed, under the Constitution, the President always retains the authority to recall the Congress. U.S. Const. art. II, § 3. That he could have done so did not lead the Court in *The Pocket Veto Case* to conclude that a return veto could have been exercised in lieu of the pocket veto. We thus conclude that the mere reservation by the congressional leadership of the power to recall the Congress does not alter the fact that Congress has adjourned and dispersed, rendering a pocket veto appropriate.

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*